# United States Court of Appeals
## For the First Circuit

No. 21-1146

JONATHAN MONSARRAT,

Plaintiff, Appellant,

v.

RON NEWMAN,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Kayatta, Lipez, and Gelpí,
Circuit Judges.

Richard A. Goren, with whom The Law Office of Richard Goren, Ryan D. Sullivan, and Sullivan Legal, PC were on brief, for appellant.
Dan Booth, with whom Dan Booth Law LLC was on brief, for appellee.

March 10, 2022

KAYATTA, Circuit Judge. Ron Newman, a moderator of a neighborhood's online forum, copied the forum's discussion threads and then reposted them to a new online platform. The reposted threads included comments that allegedly defamed the plaintiff Jonathan Monsarrat. The threads also included a communication by Monsarrat for which he had obtained a registered copyright. Monsarrat alleges that Newman is liable for defamation and for copyright infringement arising from those actions. Granting a motion to dismiss the complaint, the district court held that Newman established two affirmative defenses to Monsarrat's claims: immunity from liability under section 230 of the Communications Decency Act as to Monsarrat's defamation claim and fair use as to Monsarrat's copyright claim. For the following reasons, we agree and affirm the dismissal of Monsarrat's complaint.

**I.**

We start by reciting the essential facts as alleged in Monsarrat's complaint, supplemented by relevant undisputed items. See McCloskey v. Mueller, 446 F.3d 262, 264 (1st Cir. 2006). Between 2002 and 2017, residents of Davis Square in Somerville, Massachusetts, used the Russian-owned social networking platform LiveJournal as an online bulletin board and community forum for topics of interest to the neighborhood. Monsarrat, an entrepreneur who develops augmented reality video games, was a member of this online community. Beginning in 2010, anonymous

users, writing under pseudonyms, made several defamatory posts concerning Monsarrat on the Davis Square forum, including statements accusing Monsarrat of being a "sexual predator" and a "child predator."  Monsarrat responded with a pair of lawsuits (unrelated to the present action) -- one in 2013 seeking damages for the defamatory posts and another in 2017 seeking the removal of a different webpage that referenced the posts.

In April 2017, LiveJournal revised its terms of service to comply with Russian law, which permits censorship of certain online content.  After this change, Newman, a moderator for the Davis Square forum, decided to move the forum from LiveJournal to another social networking platform called Dreamwidth, which was not subject to Russian censorship and was open to content no longer welcome on LiveJournal after its terms of service revision.  To move the Davis Square forum from LiveJournal to Dreamwidth, Newman copied the forum's discussion threads from the LiveJournal website and reposted them on the new Dreamwidth website.  The threads as reposted in toto on the new host included both the allegedly defamatory posts relating to Monsarrat as well as a post authored by Monsarrat for which he had obtained a certificate of registration from the United States Copyright Office.  The posts copied to Dreamwidth from LiveJournal appear to be substantively unchanged, with the original authors, dates, and message intact.

Neither party contends we need know more about the precise technical means by which the content was moved.

Newman's copying of this content from LiveJournal to Dreamwidth prompted Monsarrat to sue Newman in federal court for defamation under Massachusetts law and copyright infringement. Newman moved to dismiss for failure to state a claim on both counts. See Fed. R. Civ. Pro. 12(b)(6). The district court granted Newman's motion. Monsarrat v. Newman, 514 F. Supp. 3d 386, 389 (D. Mass. 2021). As to Monsarrat's defamation claim, the district court held that Newman was immune from liability for his republication of the allegedly defamatory statements because Newman fell within the safe harbor provided by section 230 of the Communications Decency Act, 47 U.S.C. § 230. Monsarrat, 514 F. Supp. 3d at 393. As to Monsarrat's copyright claim, the court found that, based on the operative complaint, Newman's reproduction of Monsarrat's post constituted fair use -- a statutory exception to the otherwise exclusive right that copyright law affords to copyright holders. Id. at 392. Monsarrat then timely filed this appeal.

## II.

We review the district court's dismissal for failure to state a claim de novo. Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007). In conducting this assessment, we are not limited by the district court's reasoning

- 4 -

and "may affirm an order of dismissal on any basis made apparent by the record."  McCloskey, 446 F.3d at 266.

Affirmative defenses may be raised on a motion to dismiss under Rule 12(b)(6) so long as the facts establishing the defense are clear from the face of the complaint as supplemented by "matters fairly incorporated within it and matters susceptible to judicial notice."  Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003)).  Dismissal based on an affirmative defense is appropriate only where there is "'no doubt' that the plaintiff's claim is barred by the raised defense."  Id. (quoting Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001)).

**III.**

We consider Newman's entitlement to two affirmative defenses: immunity under section 230 (as to Monsarrat's state law defamation claim) and fair use (as to Monsarrat's copyright claim).

**A.**

We first assess Monsarrat's challenge to the district court's conclusion that section 230 of the Communications Decency Act, 47 U.S.C. § 230, shields Newman from liability for republishing allegedly defamatory posts concerning Monsarrat. Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

Id. § 230(c)(1).  It further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Id. § 230(e)(3).

Accordingly, a defendant is shielded from liability for a state law claim if:

> (1) [the defendant] is a "provider or user of an interactive computer service"; (2) the claim is based on "information provided by another information content provider"; and (3) the claim would treat [the defendant] "as the publisher or speaker" of that information.

Lycos, 478 F.3d at 418 (quoting 47 U.S.C. § 230(c)(1)).[1]  We have explained that immunity under section 230 "should be broadly construed."  Id. at 419; accord Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 18 (1st Cir. 2016).

Because Monsarrat does not dispute that Newman qualifies as a "user" under section 230, we need only address the second and third elements of our test.

**1.**

We begin with the second element, which turns on whether Monsarrat seeks to hold Newman liable for "information provided by another information content provider."  47 U.S.C. § 230(c)(1).  We

---

[1] Section 230 contains a few exceptions, see, e.g., 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."); however, none of those exceptions are applicable to this case.

have explained that a "key limitation" to section 230 immunity is that it "only applies when the information that forms the basis for the state law claim has been provided by 'another information content provider.'" Lycos, 478 F.3d at 419 (emphasis removed) (quoting 47 U.S.C. § 230(c)(1)). A user or provider of an interactive computer service remains liable for its own speech. Cf. id. at 419-20. Accordingly, if Newman were himself an "information content provider" of the allegedly defamatory posts, then Monsarrat's state law claim would not be based only on "information provided by another information content provider" and section 230 would present no bar to liability.

Section 230 defines "information content provider" to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). We have emphasized that this definition is "broad" and encompasses "even those who are responsible for the development of content only 'in part.'" Lycos, 478 F.3d at 419. It is undisputed that Newman did not create the original allegedly defamatory posts on LiveJournal. The key question then is whether Newman -- by reposting to Dreamwidth a lengthy thread including libelous information -- was nonetheless "responsible, in whole or in part," for the "development of" that information, such that he is liable as an information content provider.

- 7 -

Here, Newman copied the allegedly defamatory posts from LiveJournal to Dreamwidth verbatim. He did not encourage or compel the original authors to produce the libelous information. And, in the manner and form of republishing the posts, he neither offered nor implied any view of his own about the posts. In short, Newman did nothing to contribute to the posts' unlawfulness beyond displaying them on the new Dreamwidth website.

Monsarrat nevertheless argues that Newman is responsible for the allegedly defamatory posts, even though they were initially authored by third parties, as it was Newman who posted the content on Dreamwidth, a different interactive computer service with a different audience. The Ninth Circuit rejected this precise line of reasoning in Kimzey v. Yelp! Inc., 836 F.3d 1263, 1271 (9th Cir. 2016) ("[P]roliferation and dissemination of content does not equal creation or development of content."). There, our sister circuit held that the online platform Yelp was not liable for its "downstream distribution" to a separate search engine of content generated by a third party. Id. at 1270. As the court explained, "[n]othing in the text of [section 230] indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'" Id. (quoting 47 U.S.C. § 230(c)(1)). Accordingly, "[j]ust as Yelp is immune from liability under [section 230] for posting user-generated content on its own website, Yelp is not liable for

- 8 -

disseminating the same content in essentially the same format to a [different platform], as this action does not change the origin of the third-party content." Id. We have cited to this language in Kimzey favorably. See Small Just. LLC v. Xcentric Ventures LLC, 873 F.3d 313, 322-23 (1st Cir. 2017). And we agree with its interpretation of the scope of section 230 immunity, at least as it pertains to Newman, who replicated the content and basic format of the third-party LiveJournal posts on Dreamwidth. Cf. Marshall's Locksmith Serv. Inc. v. Google, LLC, 925 F.3d 1263, 1268-69 (D.C. Cir. 2019) (explaining that "the posting of third-party content" from one website to another "is plainly within the immunity provided by § 230").

Monsarrat also contends that Newman's republication of posts to Dreamwidth "developed" the defamatory information by turning non-actionable libel (for which the statute of limitations had run) into actionable libel. However, Monsarrat's argument misses the distinction between what makes libel substantively wrongful and what makes a claim for libel procedurally actionable. A statute of limitations plays no role in ascertaining whether conduct is wrongful. Rather, it merely sets the deadline by which a legal challenge to that conduct need be initiated. Here, the relative recency of the reposting may mean that Newman has no limitations defense. But it says nothing at all about whether he needs such a defense.

In sum, we find that Newman meets the second element of our test; i.e., the claim against him is based on "information provided by another information content provider."

**2.**

We consider next whether Monsarrat's defamation claim seeks to treat Newman as the publisher of the information at issue. The answer is plainly yes. Monsarrat's complaint expressly seeks to make Newman liable for "publish[ing] on Dreamwidth" the allegedly defamatory material.

The only authority Monsarrat cites in support of his contrary position is language from the Fourth Circuit's decision in Zeran v. America Online, Inc. supposedly confining the reach of section 230 immunity to an online publisher's exercise of its "traditional editorial functions." 129 F.3d 327, 330 (4th Cir. 1997). But even if his reading were accurate, Monsarrat misquotes Zeran by omitting that one of the described "traditional editorial functions" is determining whether to "publish" certain information.[2] Id. Newman's decision to move user posts from LiveJournal to Dreamwidth naturally involved a decision about what content to publish on the new platform. Cf. Backpage.com, 817 F.3d at 21 (explaining that "choices about what content can appear on the website and in what form[] are editorial choices that fall

---

[2] Monsarrat's brief omits the word "publish" from its direct quote to Zeran (without using ellipses).

- 10 -

within the purview of traditional publisher functions").  Thus, Newman satisfies the third and final element of our test.

* * *

With all three elements undoubtedly satisfied on the face of Monsarrat's complaint as fairly supplemented by its referenced writings, we affirm the district court's holding that Newman is entitled to immunity under section 230 for his republication of the allegedly defamatory posts from LiveJournal to Dreamwidth.

**B.**

We next consider Monsarrat's copyright claim.  In the middle of a lengthy discussion thread on the Davis Square LiveJournal forum, Monsarrat posted the following message in February 2010:

 **Violation of LiveJournal abuse policies**
👤 make_you_laugh
February 6 2010, 21:03:40 UTC

LiveJournal's abuse policies are at http://www.livejournal.com/abuse/policy.bml

Under the section "Harassment", it says that "If a user makes a statement which encourages or incites others to harass another person in any way, access to that content will be disabled. This can also extend to entries in which harassment has not been explicitly called for, but is implied, at the discretion of the Abuse Prevention Team."

This is it. I'll give everyone here until Monday at 12pm to remove your comments from this board. At that point, I'm collecting every single one of them. I have already filed an abuse report with LiveJournal but won't call them until Monday at 12pm.

When Newman migrated the Davis Square forum to the more accommodating Dreamwidth platform seven years later, he copied

over the thread that included Monsarrat's February 2010 post. As it turned out, Monsarrat had registered his rather prosaic threat with the United States Copyright Office in 2012. He now complains that Newman's copying of his post infringed his copyright. The district court dismissed Monsarrat's copyright claim, finding Newman's reproduction of Monsarrat's work constituted a "fair use" permitted by copyright law. Monsarrat, 514 F. Supp. 3d at 392. For the following reasons, we agree.

Fair use is a statutory limitation to the otherwise exclusive rights enjoyed by copyright holders. See 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright."). It "creates a privilege for others to use the copyrighted material in a reasonable manner despite the lack of the owner's consent." Soc'y of Holy Transfig. Monastery, Inc. v. Gregory, 689 F.3d 29, 59 (1st Cir. 2012) (quoting Weissmann v. Freeman, 868 F.2d 1313, 1323 (2d Cir. 1989)). Fair use is an "affirmative defense" for which its proponent -- in this case, Newman -- bears the burden of proof. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994). Accordingly, given that burden allocation and the typical factual considerations necessary to determine application of the defense, a motion to dismiss pursuant to Rule 12(b)(6) generally provides an unaccommodating vehicle for adjudicating fair use.

Nevertheless, sometimes the defense of fair use is capable of vindication on a motion to dismiss. See, e.g., TCA Television Corp. v. McCollum, 839 F.3d 168, 178 (2d Cir. 2016); Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 690 (7th Cir. 2012); Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 530 (9th Cir. 2008). This appeal would appear to present another such example: Simply by looking at the copyrighted work, its purpose as alleged in the complaint, and what Monsarrat concedes to be the circumstances and nature of its copying, we can see no plausible argument that Newman has not established fair use.

To ascertain fair use, Congress has directed that we consider the following non-exclusive factors in assessing a fair use defense:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. We evaluate fair use on a case-by-case basis and weigh the factors "together in light of the purposes of copyright." Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 21 (1st Cir. 2000) (quoting Campbell, 510 U.S. at 578).

First, we look to "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  As we have explained:

> Our task under the first prong is to assess "whether and to what extent the new work is 'transformative,'" that is, "whether the new work merely supersedes the objects of the original creation" or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."

Gregory, 689 F.3d at 59-60 (quoting Campbell, 510 U.S. at 579).

Monsarrat argues that his pleading -- even as supplemented by fairly incorporated documents and concessions -- does not allow us to determine with sufficient certainty Newman's purpose in reposting Monsarrat's copyrighted work from the Davis Square LiveJournal forum to Dreamwidth.  Indeed, Monsarrat contends that his complaint plausibly alleges that Newman copied the thread containing Monsarrat's post "as an integral part of [Newman's] defamatory statements falsely accusing the Plaintiff of despicable crimes."  To this extent, Monsarrat fairly complains that the district court overreached when it found that Newman's reposting of the thread was "solely for historical and preservationist purposes."  Monsarrat, 514 F. Supp. 3d at 391.

The problem for Monsarrat is that we need not necessarily determine Newman's actual purpose in copying the forum posts from the LiveJournal platform to the Dreamwidth platform to conclude that he reproduced Monsarrat's work for a fundamentally different reason than that which led to its creation.  Monsarrat's goal in authoring his short, time-sensitive work was plainly to encourage users in 2010 to immediately stop harassing him.  Toward that end, he highlighted LiveJournal's abuse policy and threatened to take imminent action against them.  Monsarrat cannot claim with a straight face that Newman's copying -- seven years later and on a different platform -- was aimed at the same purpose.  So, while we cannot be sure, given the present record, about the extent to which Newman's work is transformative, it is at least minimally so.  Cf. Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609 (2d Cir. 2006) (displaying copyrighted images in a timeline, even without additional commentary, was "transformative" because it was "plainly different from the original purpose for which they were created").

Another consideration in our assessment of the purpose and character of Newman's use is whether the "use is of a commercial nature."  17 U.S.C. § 107(1).  As the Supreme Court has explained, "[t]he fact that a publication was commercial as opposed to nonprofit . . . tends to weigh against a finding of fair use," Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562

- 15 -

(1985), although commercial gain alone is not dispositive, Campbell, 510 U.S. at 585. We have explained, however, that this element is of greater import "the lesser the transformative nature of the work." Gregory, 689 F.3d at 60; cf. Núñez, 235 F.3d at 22.

Newman is aided here by Monsarrat's repeated concession at oral argument that the copyrighted work has no commercial value. To be sure, we have noted that the commercial/noncommercial inquiry encompasses not just "dollars and coins" but "other non-monetary calculable benefits or advantages" as well. Gregory, 689 F.3d at 61. But Monsarrat does not claim that Newman reproduced his copyrighted post to accrue any profit -- financial or otherwise -- nor is there any indication of such a benefit on either the face of the complaint or the copyrighted work and resulting reproduction.

Monsarrat's only response is to press his claim that Newman's copying of posts from LiveJournal to Dreamwidth was aimed at defaming him. He argues that such a purpose -- even if transformative or noncommercial -- merits no weight because it implies bad faith on the part of Newman. Yet while Monsarrat explains how the republication of the allegedly defamatory comments might be said to be in bad faith for Rule 12(b)(6) purposes, he offers no cogent rationale for why Newman's reproduction of the copyrighted work itself (a post Monsarrat himself authored) was intended to defame Monsarrat. On such a

record, "we need not credit a plaintiff's '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" Alston v. Spiegel, 988 F.3d 564, 571 (1st Cir. 2021) (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Thus, regardless of the role that Newman's state of mind might play in the fair use analysis, we see no credible allegation that his alleged infringement was in bad faith as relevant to our fair use inquiry.[3]

Considering the foregoing, we find that the pleadings establish that Newman's purpose is noncommercial and at least marginally transformative. Accordingly, we conclude that the first factor leans in favor of fair use, although we give it little weight.

**2.**

Next, we assess "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "calls for recognition that some works are closer to the core of intended copyright protection than

---

[3] There is some question whether an alleged infringer's bad faith has much relevance to the fair use analysis. See Blanch v. Koons, 467 F.3d 244, 255 (2d Cir. 2006); cf. Campbell, 510 U.S. at 585 n.18. In any event, the kind of bad faith discussed in Harper & Row -- the only authority Monsarrat cites in support of his assertion that bad faith precludes fair use -- contemplates something akin to egregious intentional copying for commercial gain. See 471 U.S. at 562-63 (discussing the defendant's "intended purpose of supplanting the copyright holder's commercially valuable right of first publication" and its knowing exploitation of "a purloined manuscript").

- 17 -

others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. We consider two elements: (1) whether the copyrighted work is "factual or creative"; and (2) whether the copyrighted work has "previously been published." Gregory, 689 F.3d at 61. The scope of fair use is narrower when works "fall closer to the creative end of the copyright spectrum than the informational or factual end" and when they have not previously been published. Id. at 61-62. Because there is no dispute that Monsarrat's post was posted publicly on the Davis Square forum prior to Newman's copying, our inquiry need only address the first element.

Monsarrat argues on appeal that even his unremarkable post about LiveJournal's abuse policy qualifies as a creative and literary work under the second fair use factor. He relies on the fact that the Copyright Office, in issuing a certificate of registration to Monsarrat for the work, determined that it met the requisite degree of creativity to satisfy the originality requirement for copyright protection. Monsarrat contends, in any event, that it was premature on a motion to dismiss for the district court to adjudge the nature of his work.

It is plain from the face of this copyrighted work that it lies much more on the factual and informational side of the line than near the "core" of copyright protection, Campbell, 510 U.S. at 586. Indeed, as the district court noted, the bulk of

- 18 -

Monsarrat's post contains a verbatim quote from the LiveJournal harassment policy, a publicly available document written by someone else. The remainder of the post merely consists of brief workaday prose informing other Davis Square LiveJournal users of Monsarrat's threatened future actions. Thus, on the basis of the complaint and the copyrighted work alone, we have no difficulty concluding that the second factor weighs strongly in favor of fair use.

**3.**

Third, we consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). There is no dispute that Newman copied the whole of Monsarrat's copyrighted post. Typically, copying an entire work verbatim will "militate[] against a finding of fair use." Gregory, 689 F.3d at 62 (alteration in original) (quoting Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1118 (9th Cir. 2000)). But we have explained that our assessment "must be a flexible one, rather than a simple determination of the percentage used." Núñez, 235 F.3d at 24.

Even verbatim copying can constitute fair use if it is "consistent with or [no] more than necessary to further the 'purpose and character of the use.'" Id. (quoting Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 144 (2d Cir. 1998)). Thus, we have held that the third factor is "of little

- 19 -

consequence" when a defendant copies an entire work but "copy[ing] any less than that would have made the [resulting copy] useless." Id.

Monsarrat offers no plausible rebuttal to the contention that it would have made scant sense for Newman to take just part of the copyrighted post. Indeed, given that Newman faithfully duplicated the rest of the thread containing Monsarrat's work, consisting of more than 400 comments, selectively copying over only a portion of Monsarrat's post would have misrepresented what Monsarrat wrote. All in all, the fact that the work was copied in its entirety adds little if anything to the brief against a finding of fair use. Accordingly, the third factor favors neither side.

**4.**

Finally, we assess "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The Supreme Court has referred to this factor as "the single most important element of fair use." See Harper & Row, 471 U.S. at 566. To evaluate the fourth factor, we look to both "the degree of market harm caused by the alleged infringer's actions" and "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original."

- 20 -

Gregory, 689 F.3d at 64 (alteration in original) (quoting Campbell, 510 U.S. at 590).

The district court found that this factor weighs in favor of fair use because "[t]here is no plausible market for the copyrighted post and thus no likelihood that Newman's reproduction could have any harmful market consequences." Monsarrat, 514 F. Supp. 3d at 392. Monsarrat does not contest this assertion in his briefs and, indeed, expressly conceded at oral argument that there is no potential market for his work. Rather, Monsarrat contends that the fourth fair use factor contemplates an assessment of not just the potential market but also the inherent value of the copyrighted work. He suggests that Newman's use diminishes Monsarrat's property interest in the post.

Monsarrat is certainly correct that the fourth element of the fair use analysis references the "value of the copyrighted work" and not just the "potential market" for that work. 17 U.S.C. § 107(4). And we have explained that a work's value "cannot be reduced to strictly monetary terms." Gregory, 689 F.3d at 64. But Monsarrat points to no other indicia of value other than calling the copyright itself proof that he has a property interest in the work. And if we deemed that the mere copyright endows a work with intrinsic value sufficient to weigh significantly in the fair use analysis, such a value would be present in every case, and thus prove to be largely beside the point in differentiating

one case from another.  With no other reason to think that the work has any value, we find that the fourth element weighs strongly in favor of fair use.

* * *

Three factors weigh in favor of fair use -- including "the single most important element of fair use," Harper & Row, 471 U.S. at 566 -- and one factor is neutral.  This leaves us with no doubt that Newman is entitled to his fair use defense. Accordingly, the district court's dismissal of Monsarrat's copyright claim was proper.

## IV.

We affirm the judgment of the district court.